IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JESSICA BENSON,

    *Plaintiff,*

vs.

TERRY D. BRYAN, et al.,

    *Defendants.*

Case No. 13-2483-EFM-KMH

**MEMORANDUM AND ORDER**

    Plaintiff Jessica Benson sued her former employer, Terry Bryan; his pet grooming business, Pampered Paws, LLC; and its veterinarian of record, Jonathan Austin, alleging that Defendants installed a concealed camera in the storage room of the business to watch her tan naked. Benson asserts invasion of privacy and outrage claims. Specifically, Benson claims that Defendants intentionally intruded upon her seclusion and intentionally, recklessly, or negligently caused her emotional distress. On September 30, 2014, this Court presided over a bench trial to determine as to Defendant Austin—the only remaining defendant—liability and damages. Austin had announced that he would not appear to contest the trial, but he did not confess judgment or stipulate to a damage award. Following the brief bench trial, the Court took the matter under advisement. The Court now makes the following findings of fact and conclusions of law and, for the reasons discussed below, enters judgment for Defendant Austin.

## I.     Findings of Fact[1]

Defendant Bryan opened Pampered Paws, a pet boarding and grooming business, in 2006. Bryan located Pampered Paws in a building that he owned. The building also contained his other business, Pressure Washers Unlimited. Dividing the two businesses was a vacant workshop area, including a room that Bryan used for storage. In the storage room, Bryan kept various boxes of items that he and his sons received when his grandmother died in July 2012, as well as a tanning bed.

---

[1] The facts recited in this order are taken from two sources. First, the September 30, 2014 bench trial informs the Court's factual findings. No official transcript of the bench trial has been prepared. But throughout this order the Court references an unofficial record of the bench trial proceedings generated by a sworn court reporter using realtime transcription.
  Second, at Benson's unopposed request, the Court considers an official transcript from the related criminal jury trial of Defendant Bryan. The jury in that trial acquitted Bryan, and Kansas never filed criminal charges against Defendant Austin. Here, pursuant to agreement among the parties, Defendant Austin did not appear or present evidence at the bench trial. Benson, however, presented live testimony and requested that the Court take "judicial notice" of the related criminal trial transcript. It is unclear from the record whether Benson's request for judicial notice of the transcript was intended: (1) to cover the entire transcript; (2) to cover only the select portions read into the bench trial record; or (3) merely as a request to admit the transcript—or select portions—into the evidentiary record without the conclusive effect of notice.
  To be the proper subject of judicial notice, a fact must be "not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). The effect of noticing an adjudicative fact is to accept the fact as conclusively determined and preclude further rebutting evidence. *See, e.g.*, *United States v. Boyd*, 289 F.3d 1254, 1258 (10th Cir. 2002); *United States v. Husein*, 478 F.3d 318, 337 (6th Cir. 2007). It is commonplace for courts to take judicial notice of court records. *See, e.g.*, *Hutchinson v. Hahn*, 402 Fed. App'x 391, 394–95 (10th Cir. 2010). But notice of court records generally is limited to establishing the existence of a document or an official act, not the truth of the facts stated therein. *See, e.g.*, *Hansen v. Harper Excavating, Inc.*, 641 F.3d 1216, 1219 n.2, 1226–28 (10th Cir. 2011) (noticing documents from party's earlier ERISA action against employer, in part, to evaluate earlier action's res judicata effect on present suit); *In re Delta Resources, Inc.*, 54 F.3d 722, 725 (11th Cir. 1995) (quoting *United States v. Jones*, 29 F.3d 1549, 1553–54 (11th Cir. 1994)) ("Court may take judicial 'notice of another court's order . . . for the limited purpose of recognizing the 'judicial act' that the order represents on the subject matter of the litigation and related filings.'").
  Here, the Court refuses to take judicial notice of the criminal trial transcript, though the Court receives the transcript's testimony as evidence to aid its fact-finding obligation. *See* Fed. R. Civ. P. 52(a)(1). Although Defendant Austin did not present evidence or objection to rebut Benson's request for notice of the transcript's content, Defendant Austin denies liability. *See* Answer to Plaintiff's Second Amended Complaint, Doc. 29. The truth of the testimony contained in the criminal transcript therefore is disputed. Accordingly, the Court will not *automatically* consider the transcript's contents conclusive of the facts recited therein. But the Court will receive the transcript's testimony as evidence into the record, recognizing that Defendant Austin's agreement not to produce evidence at the bench trial will give more conclusive effect to the transcript's testimony.

In August 2012, Bryan hired Jessica Benson to work part-time at Pampered Paws. After Benson began work, Bryan informed Benson that he owned a tanning bed that he kept in the storage room in the garage area next to Pampered Paws. Bryan told Benson that she, like other Pampered Paws employees and Bryan's family, had his permission to use the tanning bed. Bryan requested, however, that Pampered Paws employees use the tanning bed only when not scheduled to work and, if after business hours, to notify Bryan before tanning.

On September 18, 2012, Defendants Bryan and Austin agreed that Austin would install a camera in the storage room next to Pampered Paws. Austin, a veterinarian of twenty-plus years, worked with Bryan and Pampered Paws on a limited basis as the facility's veterinarian of record. As Pampered Paws associated veterinarian, Austin conducted annual inspections and provided other state-required oversight, but he received no profits from the Pampered Paws business. As professional acquaintances, Bryan and Austin occasionally exchanged favors. That day, Austin agreed to meet Bryan at Pressure Washers Unlimited to help Bryan—who has limited mobility from having undergone five back surgeries—move a pressure washer for a job that evening. On the return drive, Bryan and Austin discussed Bryan's concern that someone stole family heirlooms from the storage room between his businesses. Austin suggested that Bryan use a camera to monitor the property in his storage room. Bryan agreed.

After returning from the pressure washing job, Bryan directed Austin to an available camera in the storage room and then exited the storage room to do other work. In Bryan's absence, Austin positioned the camera "the best [he] could in a place [he] thought was concealed and would be a good place to monitor someone coming and going" from the storage room.[2]

---

[2] Realtime Record of Bench Trial, pp. 23–24 (quoting Transcript of Requested Portion of *Kansas v. Bryan*, No. 13-CR-327 (Reno County Dec. 18, 2013), p. 194 [hereinafter Transcript of Criminal Jury Trial]).

Austin located the camera on top of a box, beneath a drop-leaf table, covered by a towel with a slit for the camera lens. Austin used an extension cord to plug the camera in to a power outlet because otherwise he "couldn't get the camera far enough in the room to get the angle it needed to have to see the door."[3] Though Austin was aware that the storage room contained a tanning bed, Austin and Bryan never discussed the possibility of people undressing or tanning in the storage room. Austin denied placing the camera with the desire to see anyone naked or use the tanning bed. And Bryan never indicated to Austin that he intended to use the camera to watch others naked. Austin installed the camera for the stated purpose of helping Bryan protect his grandmother's possessions. After placing the camera, Austin left and never returned to the location. Austin never tested the camera, observed its live video feed, or enabled it to record.

The day after Austin installed the camera, September 19, 2012, Benson visited the storage room to tan. She was not scheduled to work that day. Without notifying Bryan, Benson arrived at Pampered Paws during mid-afternoon, business hours. Benson previously had used the tanning bed about three or four times, so she felt comfortable arriving to tan that afternoon. Benson entered the unlocked storage room, locked the doors, undressed entirely, and started tanning. About five to fifteen minutes later, Benson looked past her feet in the tanning bed and noticed a camera that resembled other cameras used throughout Pampered Paws. Benson was not aware whether the camera was on or recording, but she determined that "it appeared to be hidden in a specific position . . . to see exactly everything in the tanning bed from [her] feet up."[4] Scared but seeking to avoid alerting anyone who might be viewing her or her awareness of the camera, Benson closed her legs, got out of the tanning bed, dressed, and left the room. After

---

[3] Realtime Record of Bench Trial, p. 24 (quoting Transcript of Criminal Jury Trial, pp. 194–95).

[4] Realtime Record of Bench Trial, p. 31.

briefly speaking with a coworker who also knew nothing about the camera, Benson returned to the room and confirmed that the camera was plugged in. Benson temporarily unplugged the camera to take pictures with her cellphone of "every angle [she] could so that you could see exactly what [the camera] was looking at and how it was positioned and [that] it looked like it was hidden."[5] Bryan was absent from the business all day.

A few hours later, Benson reported the incident to police. The intake officer who received Benson's report noted that she appeared "distraught, almost in tears," horrified "at the thought she may have been videotaped."[6] Benson provided the officer the pictures that she took with her cellphone. Benson was certain she did not touch or move the camera when she "finagled" her way behind it to take pictures.[7] She reported to the intake officer, however, that "the camera felt warm to the touch."[8] No officer investigated further the extent to which Benson touched or possibly moved the camera.

The next day, September 20, 2012, officers visited Pampered Paws and its adjoining workshop. Bryan voluntarily met the officers at his business and accompanied them during their investigation. Officers discovered the camera in the location reported—beneath a table, covered by a towel, pointed away from the door, and facing the tanning bed. The wireless camera transmitted live video to a monitor down the hallway in Bryan's office. Officers who observed the monitor during the investigation noted that the camera showed only the full body of a person lying in, and the legs of an individual walking around, the tanning bed. Bryan indicated to

---

[5] Realtime Record of Bench Trial, p. 37.

[6] Realtime Record of Bench Trial, p. 9 (quoting Transcript of Criminal Jury Trial, pp. 25, 28–29).

[7] Realtime Record of Bench Trial, p. 37.

[8] Transcript of Criminal Jury Trial, p. 28.

officers that he had the camera installed the day before to monitor his property.[9] After collecting and analyzing evidence from Bryan's office, officers found no evidence of recordings from the storage-room camera.

Benson attributes multiple harms to the incident. She considers the event to have violated her expectation of "full privacy"—that she could tan, as invited, "completely alone" in a room without anyone entering or viewing her.[10] She never gave permission to be photographed or videotaped while tanning. The perceived invasion of her privacy has caused her tremendous anxiety. She now avoids tanning. But when required to tan for special occasions, she wears a swimsuit and is vigilant for cameras. Additionally, Benson quit her job at Pampered Paws immediately following the incident. Concerned about working for "another male boss that would be creepy like [Bryan]," she temporarily returned to her previous job.[11] But she struggled to balance necessary part-time employment, school obligations, and her anxiety. As her concern for providing for herself increased, her concentration on school decreased. Her grades and mood worsened, contributing to a sense that she was disappointing her family. Eventually, Benson lost her school loan, leaving her unable to afford her classes.

## II. Conclusions of Law

Initially, the Court must decide whether the preceding facts demonstrate that Defendant Austin is liable for intruding on Benson's seclusion and causing her emotional distress. If the

---

[9] The Court notes that evidence at Bryan's criminal trial indicates that he informed officers that *he* installed the camera. Bryan later tempers that admission with testimony that he did not install the camera, but, when speaking with investigating officers, did not want to unnecessarily inculpate Austin when he believed no crime had been committed. Considering Benson's endorsement at the unopposed bench trial of Austin's criminal trial testimony that he placed the camera, the Court accepts that testimony as true. Accordingly, the Court understands Bryan's statement that he installed the camera as being an admission that he *had the camera installed* by Austin.

[10] Realtime Record of Bench Trial, p. 33.

[11] Realtime Record of Bench Trial, p. 41.

Court finds Austin liable, it will then need to determine Benson's damages and allocate those damages among Defendants. Because Benson has failed to meet her burden of proof to establish that Austin acted with the requisite intent to make him liable, the Court need not consider Benson's damages.[12]

Benson alleges that Austin intentionally intruded upon her seclusion and intentionally or recklessly caused her emotional distress. A federal court sitting in diversity will apply the substantive rules of the forum state.[13] Under Kansas law, one will be liable for an invasion of the right of privacy of another if he "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another" and "the intrusion would be highly offensive to a reasonable man."[14] A court will impose liability for the intentional infliction of emotional distress or outrage, as it is sometimes called, if plaintiff proves that: (1) defendant's conduct was "intentional or in reckless disregard of plaintiff;" (2) defendant's conduct was "extreme and outrageous;" (3) there is a "causal connection between defendant's conduct and plaintiff's mental distress;" and (4) plaintiff's mental distress is "extreme and severe."[15]

The intent required to establish both causes of action is comparable. Although Kansas case law does not describe the intent necessary for intrusion upon seclusion, the Court believes

---

[12] Benson requested monetary damages for pain and suffering totaling $350,000. However, she presented no evidence or explanation to substantiate the Court's authority to award the amount requested. She also provided little guidance to assist the Court's obligation to apportion damages among Defendants.

[13] *Cook v. Atchison, Topeka & Santa Fe Ry. Co.*, 816 F. Supp. 667, 669 (D. Kan. 1993) (citing *Ferens v. John Deere Co.*, 494 U.S. 516, 519 (1990)). The parties do not dispute that Kansas law applies.

[14] *Froelich v. Adair*, 213 Kan. 357, 358, 516 P.2d 993, 995 (1973) (quoting Restatement (Second) of Torts § 652B); *see also Rowell v. King*, 234 Fed. App'x 821, 826 (10th Cir. 2007) (quoting *Froelich*, 213 Kan. at 358).

[15] *Roberts v. Saylor*, 230 Kan. 289, 292, 637 P.2d 1175, 1179 (1981); *see also Valadez v. Emmis Communications*, 290 Kan. 472, 476, 229 P.3d 389, 394 (2010); *Wallace v. Microsoft Corp.*, 454 Fed. App'x 663, 667 (10th Cir. 2012) (quoting *Roberts*, 230 Kan. at 292).

that the Restatement (Second) of Torts is—and to the Kansas Supreme Court would be—instructive. Kansas courts consistently rely on the Restatement (Second) of Torts to define the parameters of right to privacy actions.[16] Additionally, Kansas courts have used the Restatement's definition of *intent* to clarify intent issues.[17] As used throughout the Restatement (Second) of Torts, *intent* "denote[s] that the actor desires to cause [the] consequences of his act, or that he believes that the consequences are substantially certain to result from it."[18] Other courts have thus understood the intent element of intrusion upon seclusion to mean that defendant must believe or be substantially certain that he "lacks the necessary legal or personal permission to commit the intrusive act."[19] In other words, defendant must intend both the action and the intrusion.[20]

---

[16] *See, e.g.*, *Nicholas v. Nicholas,* 227 Kan. 171, 191–92, 83 P.3d 214, 228–29 (2004); *Dotson v. McLaughlin*, 216 Kan. 201, 208, 531 P.2d 1, 7 (1975) ("We believe that the analysis of the right of privacy as contained in the Restatement, Second, Torts s 652, is sound and that the courts of [Kansas] should follow it in fixing the boundaries for its protection."); *Froelich*, 213 Kan. at 358.

[17] *See Thomas v. Benchmark Ins. Co.*, 285 Kan. 918, 930–34, 179 P.3d 421, 429–31 (2008) (relying, in part, on Restatement's definition of "intent" to determine whether an "intentional act" has caused an "intentional injury" for purposes of motor vehicle liability insurance law); *Baska v. Scherzer*, 283 Kan. 750, 757, 763, 156 P.3d 617, 622–23, 626 (2007) (considering Restatement definition of intent to determine liability for assault and battery to unintended plaintiff).

[18] Restatement (Second) of Torts §8A (1965).

[19] *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1220–21 (10th Cir. 2003) (quoting *O'Donnell v. U.S.*, 891 F.2d 1079, 1082 (3rd Cir. 1989)) (indicating that *O'Donnell*'s analysis "originates in an interpretation of Pennsylvania law, but [the Court] finds its analysis of Restatement sections 652B and 8A persuasive"); *see also, Fletcher v. Price Chopper Foods of Trumann, Inc.*, 220 F.3d 871, 876 (8th Cir. 2000) (applying Arkansas law); *Mauri v. Smith*, 324 Or. 476, 484, 929 P.2d 307, 311 (1996) ("an actor commits an intentional intrusion if the actor either desires to cause an unauthorized intrusion or believes that an unauthorized intrusion is substantially certain to result from committing the invasive act"); *Youker v. Douglas County*, 178 Wash. App. 793, 797, 327 P.3d 1243, 1245 (2014) (quotation omitted) ("The intruder must have acted deliberately to achieve the result, with the certain belief that the result would happen"); Colo. Jury Instr., Civil 28:3 Intentional Intrusion—Defined ("A defendant intends to invade the plaintiff's privacy when (he) . . . means to invade the plaintiff's privacy, or knows that (his) . . . conduct will almost certainly cause an invasion of privacy.").

[20] *O'Donnell v. U.S.*, 891 F.2d 1079, 1082 (3rd Cir. 1989).

Similarly, the Restatement's definitions of *intent* and *reckless* guide Kansas courts' understanding of the mental state required to impose liability for outrage. Intent to cause severe emotional distress exists when one acts with the desire to cause or knowledge that his conduct will cause distress in another person.[21] Reckless conduct will provide a basis for liability when one knows or has reason to know of facts that create a high degree of probability that acting will cause emotional distress to another and, in deliberate disregard of that probability, proceeds to act.[22]

The Court is unable to conclude, *from the facts presented*, that Defendant Austin placed the camera with the mental state required to impose liability for intrusion upon seclusion or intentional infliction of emotional distress. Austin deliberately installed the camera in a concealed manner. At the time Austin installed the camera, he was aware that the storage room contained a tanning bed. And both Benson and the investigating officers reported that they discovered the camera directed at the tanning bed. Benson presents no other facts that might enable the Court to infer that Austin acted with a culpable mindset.

To infer a culpable intent from these facts would require the Court to draw additional inferences and disregard additional evidence. The Court would need to infer that because Austin initially placed the camera *he*—not Bryan or, accidentally, Benson—is responsible for the camera facing the tanning bed. Then the Court would need to infer that because Austin faced the camera toward the tanning bed, either he had a conscious desire to view someone tan without

---

[21] Pattern Instr. Kan. Civil 127.73, Recklessly or with Intent—Defined (2013); *Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1159 (10th Cir. 1981) (quoting Restatement (Second) of Torts § 46 comment i); Restatement (Second) of Torts § 46 cmt. i (1965).

[22] *Wiehe v. Kukal*, 225 Kan. 478, 483–84, 592 P.2d 860, 864–65 (1979) (discussing Restatement (Second) of Torts § 500(a) (1965)); Pattern Instr. Kan. Civil 127.73, Recklessly or with Intent—Defined (2013); Restatement (Second) of Torts § 46, cmt. i (1965).

their permission or, at a minimum, he acted with a knowing indifference to the high degree of probability that the camera would cause someone who tanned emotional distress.

To sustain these inferences, the Court would need to disregard contrary evidence. Austin denies positioning the camera toward the tanning bed. He insists that he directed the camera toward the door and left it in that position without enabling it to record. No evidence indicates that Austin returned after setting up the camera. But the evidence does suggest the possibility that Benson unintentionally moved the camera. When Austin placed the camera, moreover, he was unaware that the room was used for any purpose other than storage. Austin had no previous discussion with Bryan that anyone might undress or tan in the storage room. Austin believed that he installed the camera to help Bryan monitor his property. Austin "absolutely [did] not" place the camera in the room to allow himself or Bryan to view anyone undressing or naked.[23]

Considering these facts, the Court is unable to infer liability from the mere fact that Austin installed a concealed camera in a storage room that happened to include a tanning bed.[24] Austin's stated intent and lack of awareness that the tanning bed would be used indicate that he did not place the camera either with a belief that he was committing an intrusive act for which he lacked permission or with a conscious desire to cause emotional distress. Also, without reason to know or actual knowledge that someone would undress in the storage room, Austin cannot be said to have placed the camera with a deliberate indifference to facts that suggest a high degree

---

[23] Transcript of Criminal Jury Trial, p. 197.

[24] The Court reaches this conclusion even assuming that Benson did not inadvertently move the camera. Benson shoulders the burden to prove by a preponderance of the evidence facts that demonstrate liability. Assuming that Benson discovered the camera facing the tanning bed and did not alter its focus, the Court is still unable to conclude from the record that it is more likely than not that Austin deliberately focused the camera toward the tanning bed to invade anyone's privacy or cause anyone distress. In particular, this conclusion follows from evidence that Austin was without any information to believe that the storage room was used for any purpose other than keeping Bryan's property safe.

of probability of causing emotional distress to another.  Accordingly, Benson has failed to prove that Austin is liable for intrusion upon her seclusion or intentionally or recklessly causing her emotional distress.

Benson also alleges that Austin negligently caused her emotional distress.  Even accepting without deciding that Austin carelessly positioned the camera to face the tanning bed and, as a result, Benson suffered severe emotional distress, Benson again fails to meet her burden of proof.  "It has long been the general rule in Kansas that there can be no recovery for emotional distress suffered by the plaintiff which is caused by the negligence of the defendant unless it is accompanied by or results in physical injury to the plaintiff."[25]  Benson makes no allegation and presents no evidence of a physical injury that is the direct and proximate result of any emotional distress caused by Austin's allegedly negligent conduct.  Absent evidence of a qualifying physical injury, Benson's claim for negligent infliction of emotional distress fails.

Without determining the legal significance of Benson's harms, the Court appreciates that Benson's experience tanning in a state of undress and in potential view of a functioning camera leaves her with an authentic and enduring personal burden.  But Benson provides this Court an inadequate factual or legal basis to find Defendant Austin liable.  As such, the Court is unable to provide her the relief she seeks.

---

[25] *Hoard v. Shawnee Mission Medical Center*, 233 Kan. 267, 274, 662 P.2d 1214, 1219–20 (1983); *see also Ware ex rel. Ware v. ANW Special Educ. Co-op. No. 603*, 39 Kan. App. 2d 397, 401, 180 P.3d 610, 613 (2008); *Nkemakolam v. St. John's Military School*, 934 F. Supp. 2d 1193, 1200 (D. Kan. 2014) (applying Kansas law).

**IT IS ACCORDINGLY ORDERED** this 20th day of November, 2014, that judgment should be entered in favor of Defendant Jonathan Austin.

**IT IS SO ORDERED.**

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE